Jacqueline GRIMANDI, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Elizabeth BECHETOILLE, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Ann BOSCHER, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Christine CHAPPAT, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Helen DELBART, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Jeannine DESMOUTIER, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Marie MENIER, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Marie GUEROUT, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION
et al., Defendants.

Civ. A. Nos. 77–1239, 77–1246, 77–1233,
77–1247, 77–1232, 77–1235, 77–1238
and 77–1234.

United States District Court,
D. Kansas.

April 7, 1981.

Gerald C. Sterns, San Francisco, Cal., and James B. Zongker of Render & Kamas, Wichita, Kan., for plaintiffs.

Paul B. Swartz of Martin, Pringle, Schell & Fair, Wichita, Kan., for Beech Aircraft Corp.

Charles W. Harris of Curfman, Brainerd, Harris, Bell, Weigand & Depew, Wichita, Kan., for Pratt and Whitney Aircraft.

## MEMORANDUM AND ORDER

THEIS, Chief Judge.

This matter comes before the Court on motions to dismiss by Pratt & Whitney Aircraft of Canada, Ltd., Pratt & Whitney Aircraft Group, and United Technologies Corporation. Issues raised are capacity, personal jurisdiction, subject matter jurisdiction, and *forum non conveniens.* An evidentiary hearing has been held and the Court is prepared to rule.

## I. CAPACITY OF THE PRATT & WHITNEY AIRCRAFT GROUP

Pratt & Whitney Aircraft Group is an operating division of United Technologies. It was conceded at oral argument that Pratt & Whitney Aircraft Group is not separately incorporated. The factual basis for resolution of the issue of capacity has thus been resolved.

Under Rule 17(b), the capacity of the Pratt & Whitney Group must be determined by the law of the state in which this district court sits. Under Kansas law, individuals and corporations are the only recognized legal entities, and an unincorporated organization may not sue or be sued in its own name. *Kansas Private Club Association v. Londerholm*, 196 Kan. 1, 3, 408 P.2d 891 (1965). The motion of the Pratt & Whitney Group to dismiss will therefore be granted.

## II. PERSONAL JURISDICTION

Inquiry into the propriety of personal jurisdiction requires considering two questions. The first is whether service of process is authorized by statute or rule under circumstances applicable to the defendant. The second is whether the exercise of jurisdiction is consistent with constitutional standards. See *J.E.M. Corp. v. McClellan*, 462 F.Supp. 1246, 1247 (D.Kan.1978), and cases cited therein.

### A. The Long Arm Statute

Under K.S.A. § 60–308(b)(1), a person submits himself to jurisdiction of the courts of the State of Kansas for any causes of action arising from the transaction of any business within the state. Without question, Pratt & Whitney Aircraft of Canada, Ltd. [hereinafter Pratt & Whitney] transacted business within the State of Kansas. Pratt & Whitney sent agents to Kansas to solicit sales of the PT6 engine. As a result of those solicitations, sales of the PT6 engines were made to Beech. Subsequently, those engines were shipped into Kansas, although they were sold to Beech F.O.B. in Longueil, Quebec.

From a statutory viewpoint, the more difficult question is whether plaintiffs' causes of action "arise from" defendant's transaction of business within the state. The problem is that the engine that allegedly failed was never in the State of Kansas—instead, it was a replacement engine. The original engines were sold by Pratt & Whitney to Beech and were incorporated into Beech 99's here in Wichita. The Beech 99 that crashed, giving rise to this lawsuit, had been manufactured in Wichita. The component engine had, however, been added to the plane at a later time as a replacement, and as stated earlier, had never been sold to Beech and had never been in the State of Kansas. Since the engine that failed had not been sold to Beech in Kansas, defendant strongly contends that plaintiffs' causes of action did not arise from defendant's transaction of business in Kansas.

The crash of the Beech 99 occurred in France. That fact, however, is not dispositive as to statutory jurisdiction. The Kansas statute does not require that the cause of action arise in Kansas, only that it arise from the doing of an enumerated act which took place in Kansas. Cf. *Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F.Supp. 483, 512 (D.Kan.1978) (claim need not arise from contractual performance contemplated in Kansas).

Defendants argue that the cause of action did not arise from the transacting of any business in Kansas. For the reasons stated in this Court's prior order, he considers the term "arising from" not to require proximate causation between the enumerated act and plaintiffs' injuries. This Court interprets the statute to require only that there be some causal connection between the enumerated act and plaintiffs' cause of action. In this case that causal connection is present.

The facts shown by affidavit and by evidence establish that defendant sent agents into Kansas to solicit sales of the PT6 engine. As a result of those solicitations Beech incorporated the PT6 engine into the design of the Beech 99 aircraft. The agents of Pratt & Whitney of Canada aided in incorporating the engine into the design of the plane and in certifying the Beech 99 for use with the PT6 engine. The Beech 99 was certified for use *only* with the PT6 engine. Thus, when a replacement engine was necessary, it was inevitable that only another PT6 engine could serve as such replacement.

The evidence further indicates that the alleged defect in the PT6 engine is one common to the PT6 line of engines, and not one that was unique to the particular replacement engine that failed. Several airworthiness directives were issued as to the engine, and other air crashes have occurred because of the same defect in other engines.

But for defendant's transaction of business within the State of Kansas, a defective line of engines would not have been incorporated in and certified for use with the Beech 99, a PT6 engine would not have been installed as a replacement engine, and the crash in France probably would not have occurred. Plaintiffs' causes of action, if proved, thus flow from and are connected with defendant's transaction of business in Kansas.

The Court's decision is obviously a broad construction of the Kansas long arm statute. That statute, however, reflects a conscientious state policy to assert jurisdiction over nonresident defendants to the extent permitted by the due process clause of the Fourteenth Amendment. *Woodring v. Hall*, 200 Kan. 597, 602, 438 P.2d 135 (1968). If the statute fails to fulfill that purpose this Court cannot ignore the express language of the statute. On the other hand, this Court must recognize that purpose when construing the statute, and a broad statutory construction is required.

"A case should not be dismissed for want of jurisdiction as being outside the scope of the statute, unless by no reasonable construction of the language could it be said to fall within the statute's terms." Casad, *Long Arm and Convenient Forum*, 20 Kan.L.Rev. 1, 45 (1971). The Court therefore rules that the Kansas long arm statute authorizes service of process on Pratt & Whitney Aircraft of Canada, Ltd.

Plaintiffs have argued that service of process is authorized by K.S.A. § 17–7307, which authorizes service upon a foreign corporation for causes of action arising while the corporation was "doing business" in Kansas, without the requirement that the cause of action arise out of the doing of business in Kansas. Defendants, however, object that service was not accomplished in accordance with the statute, which prescribes compliance with K.S.A. § 60–304. Although this Court has ruled that the long arm statute authorizes service under the circumstances of this case, out of an abundance of caution the Court would suggest that plaintiffs alternatively effect service upon the Kansas Secretary of State, as provided in K.S.A. § 60–304(f).

### B. *Constitutional Standards*

■ The standard for the constitutional exercise of jurisdiction is not a mechanical or quantitative one. *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945), but rather is one of "fairness and substantial justice." It relies upon the existence of "affiliating circumstances" that create a "sufficient connection between the defendant and the forum State as to make it fair to require defense of the action in the forum." *Kulko v. Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978). Inconvenience to the parties, the interests of the state in providing a forum for the action, the quality and nature of the defendants' activities, and whether those activities give rise to plaintiffs' claims, are relevant considerations. *Kulko*, 98 S.Ct. at 1697. The focus is on the relationship among the defendant or defendants, the forum, and the litigation. The Court may also consider the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in obtaining the most efficient resolution of controversies and in the fair and orderly administration of justice. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *Energy Reserves Group,* supra, at 515.

Pratt & Whitney's contacts with Kansas are substantial. Pratt & Whitney sent agents into Kansas to solicit sales of the PT6 engine. As a result of these solicitations the PT6 was incorporated in the Beech 99, and with Pratt & Whitney's assistance, was certified for use therein. As a result of those activities, Pratt & Whitney shipped PT6 engines into Kansas for use by Beech. A full 25% of all PT6 engines manufactured by Pratt & Whitney have been shipped to Kansas for use by Beech. The total volume of this business between 1970 and 1977 ranged from $12,000,000 to $30,000,000 annually. Beech Aircraft is a primary purchaser of the PT6 engine.

Pratt & Whitney's sales in Kansas are not limited to the PT6 engine. Pratt & Whitney does approximately one hundred million dollars of business with Beech every year. Pratt & Whitney also sells merchandise to Cessna Aircraft.

Pratt & Whitney maintains two full-time employees at the Beech plant in Wichita. Additionally, members of Pratt & Whitney management make several trips to Wichita each year for consultation with Beech officials.

Since Beech is one of the largest purchasers of the PT6 engine, it is hardly unforeseeable that Pratt & Whitney would be called upon to defend actions in Kansas involving the engine. Indeed, Kansas may have been the most foreseeable forum. In *World-Wide Volkswagen*, supra, 100 S.Ct. at 566–67, the Supreme Court indicated that mere foreseeability is not the criterion. The mere likelihood that a product may find its way into the forum state is not sufficient. "Rather, it is that the defendant's conduct and connection with the forum state are such that he could reasonably anticipate being haled into court there." *Id.* at 567.

Not only was it foreseeable that PT6 engines would find their way into Kansas, Pratt & Whitney so intended. By sending agents into Kansas to solicit sales, and by subsequently shipping engines into Kansas, Pratt & Whitney purposefully availed itself of the privilege of conducting activities within the forum state.

Considerations of the fair and orderly administration of the law also weigh in favor of finding the exercise of personal jurisdiction in Kansas fundamentally fair. Plaintiffs' claim against Beech is clearly litigable in this forum, but likely would not be litigable in either Canada or Connecticut. Refusal to exercise jurisdiction over Pratt & Whitney would thus bifurcate the litigation and double the judicial time, effort and expense of the litigation.

Pratt & Whitney's contacts with Kansas are substantial, and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. It is reasonable to require Pratt & Whitney to defend here. The motion to dismiss for lack of personal jurisdiction will be denied.

*C. Jurisdiction over United Technologies*

■ United Technologies is the parent corporation of Pratt & Whitney Aircraft Company of Canada. K.S.A. § 60–308(b) authorizes service of process on "any person . . . who in person or through an agent or instrumentality does any [enumerated act]." The Kansas statute falls short of authorizing service upon any entity that owns a corporation subject to service in Kansas. *Energy Reserves Group, supra.* On the other hand, the corporate law determination that the corporation is merely an alter ego, dummy, or sham corporation, is not a requirement under the Kansas statute. This Court construes the long arm statute to authorize service on a nonresident that has directed and controlled those acts of the instrumentality that give rise to plaintiffs' claims or that has purposefully sought and foreseeably benefitted from its active relationship with an affiliated corporation that has transacted business in the forum giving rise to plaintiffs' claims. *Id.* at 514.

■ A corporation that transacts business through the instrumentality of an alter ego corporation is subject statutorily to service for causes of action arising therefrom. *Id.* at 513. Thus, although piercing the corporate veil is neither necessary nor sufficient for the constitutional exercise of jurisdiction, it will provide a sufficient, although

not necessary, basis for statutory jurisdiction when the affiliated corporation meets the requirements of K.S.A. § 60–308. This Court finds that United Technologies' relationship with Pratt & Whitney is sufficient not only to satisfy the *Energy Reserves* test, but also to satisfy the traditional alter ego test. This finding also has significance in the area of subject matter jurisdiction, to be discussed later.

Piercing the corporate veil is an essential element of plaintiffs' ultimate substantive claim against United Technologies. The Court need not, and should not, resolve conflicting evidence at this stage of the proceedings to determine whether an alter ego relationship may be found. Plaintiffs' burden at this jurisdictional stage is to establish a prima facie case. *J.E.M. Corp. v. McClellan, supra; Hanson v. Murphy,* 208 Kan. 297, 303, 491 P.2d 551 (1971). A binding determination on the alter ego question will be determined only after trial. The issue is one to be evaluated by a jury subject to appropriate instructions. See *Silkwood v. Kerr-McGee Corp.,* 485 F.Supp. 566, 601 (W.D.Okla.1979).

In *Milgo Electronic Corp. v. United Business Communications,* 623 F.2d 645, 660 (10th Cir. 1980), the Tenth Circuit enumerated several factors to be considered in determining whether the corporate veil should be pierced in the parent-subsidiary context:

"1. The parent corporation owns all or majority of the capital stock of the subsidiary.

2. The parent and subsidiary corporations have common directors or officers.

3. The parent corporation finances the subsidiary.

4. The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

5. The subsidiary has grossly inadequate capital.

6. The parent corporation pays the salaries or expenses or losses of the subsidiary.

7. The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

8. In the papers of the parent corporation, and in the statements of its officers, 'the subsidiary' is referred to as such or as a department or division.

9. The directors or executives of the subsidiary do not act independently in the interests of the subsidiary but take direction from the parent corporation.

10. The formal legal requirements of the subsidiary as a separate and independent corporation are not observed."

United Technologies owns over 97% of the stock of Pratt & Whitney. The small percentage of remaining stock is owned by executives and retired executives of United Technologies and of Pratt & Whitney. The Board of Directors of Pratt & Whitney includes the following:

Mr. Gray: Chairman of the Board and President of United Technologies

Mr. Hennessy: Sr. Vice President for Finance and Administration of United Technologies

Mr. Lowe: President of Pratt & Whitney Aircraft of Canada, and a member of the "management" of United Technologies, as evidenced by the annual report of United Technologies

Mr. A. E. Smith: Director and former Executive Officer of United Technologies

Mr. Torrell: Vice President of United Technologies and President of the Pratt & Whitney Group, which is an unincorporated operating subdivision of United Technologies.

Pratt & Whitney Aircraft of Canada, Ltd., was founded in 1928. Since its inception it has been affiliated with United Technologies (although the names of both companies have undergone changes since then).

Profits and losses of Pratt & Whitney of Canada are not separately reported, but are instead reported to the shareholders of United Technologies under the category of "Power." Long term debt of Pratt & Whitney Aircraft of Canada is listed on the balance sheet of United Technologies. Pratt & Whitney employees received technical assistance from United Technologies in developing the PT6 engine. No compensation was given for such assistance.

The Pratt & Whitney Group is an operating subdivision of United Technologies, and is composed of five entities. Three of those entities are unincorporated subdivisions. Two are subsidiary corporations of United Technologies, one of which is Pratt & Whitney Aircraft of Canada. Mr. Torrell, as President of the Pratt & Whitney Group, has the duty of coordinating the activities of Pratt & Whitney of Canada. Mr. Lowe, as President of Pratt & Whitney of Canada, reports to Mr. Torrell in the same manner as the president of the three unincorporated divisions of the Pratt & Whitney Group.

United Technologies is not merely a holding company. Compare *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir. 1978). Pratt & Whitney is doing the business of its parent, United Technologies. United Technologies is not merely an investor—it controls Pratt & Whitney's operation, and is a multi-billion dollar corporation that engages in the aeronautics industries through its various divisions and subsidiaries. Indeed, manufacturing of the PT6 engine is not confined to Pratt & Whitney Aircraft of Canada, but is also performed by another subsidiary corporation, Pratt & Whitney of West Virginia. Pratt & Whitney of West Virginia was organized by United Technologies to sell products to the United States military, which is required to purchase its products in the United States. Pratt & Whitney of West Virginia engages in sales previously handled by Pratt & Whitney of Canada. Additionally, when a strike occurred in Canada, United Technologies itself manufactured the PT6 engine in Connecticut.

Pratt & Whitney of Canada carries on the business for United Technologies in Canada.

In its annual report to the shareholders, United Technologies reports on all phases of its operations, including without distinction, those of Pratt & Whitney of Canada. Pratt & Whitney's operations are presented as those of United Technologies. Additionally, in its promotional films, United Technologies represents Pratt & Whitney engines as its own. The activities of Pratt & Whitney are considered the activities of United Technologies both by the company and by the public.

On the other hand, some factors associated with piercing the corporate veil have not been demonstrated. There has been no showing that Pratt & Whitney of Canada is undercapitalized. Also, there has been no showing that it has not observed formal legal requirements of separate incorporation. Nevertheless, the Court rules that plaintiffs have made a prima facie showing that Pratt & Whitney is the mere alter ego of United Technologies, upon whom service of process is authorized by the Kansas long arm statute. The assertion of jurisdiction over United Technologies does not offend the standards of due process. United Technologies has extended itself into the forum through the activities of its alter ego, Pratt & Whitney Aircraft of Canada. The Court could properly consider the relationship of United Technologies to Pratt & Whitney's activities in the forum even without piercing the corporate veil. *Energy Reserves,* supra, at 507. When, as here, an alter ego relationship is present, the contacts of Pratt & Whitney may be considered as the contacts of United Technologies. United Technologies has additional contacts of its own. It maintains two service representatives in Wichita, to service the various aircraft companies. Additionally, as evidenced by its own annual report, it maintains two offices within the State of Kansas. The Court finds that personal jurisdiction may constitutionally be exercised over United Technologies.

## III. SUBJECT MATTER JURISDICTION

The issue of subject matter jurisdiction extends only to Pratt & Whitney of Canada. United Technologies is a Connecticut corporation and diversity jurisdiction is concededly present.

The question of subject matter jurisdiction arises because of the requirements of diversity of citizenship. The legal issue presented is whether an alien (eight French citizens) can sue another alien (a Canadian corporation) in a United States District Court.

Diversity jurisdiction is governed by 28 U.S.C. § 1332(a), which provides:

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(c) of this title, as plaintiff and citizens of a State or of different States."

There is no provision for federal jurisdiction when one alien sues another alien. E. g., *Betar v. DeHaviland Aircraft of Canada, Ltd.,* 603 F.2d 30 (7th Cir. 1979); *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir. 1975). Section (a)(3) is not applicable, since it applies only in a suit between citizens of different states with aliens as additional parties. *Ed & Fred, Inc. v. Puritan Marine Insurance Underwriters Corp.,* 506 F.2d 757 (5th Cir. 1975). In these actions, all plaintiffs are aliens, and section (a)(3) thus does not apply. At the very least, there must be a legitimate dispute between two American citizens. Wright & Miller, *Federal Practice and Procedure* § 3604 (1975).

Plaintiffs rely on three arguments to avoid dismissal of Pratt & Whitney of Canada as a defendant. They are: (1) Pratt & Whitney should be deemed a citizen of the state wherein it maintains its principal

place of business *within the United States*; (2) the presence of United Technologies, a Connecticut corporation, confers jurisdiction on the Court and permits the Court to exercise ancillary jurisdiction over the claims against Pratt & Whitney of Canada; and (3) the corporate veil may be pierced, so as to impute to Pratt & Whitney of Canada the corporate citizenship of United Technologies. The Court will consider each argument in turn.

A. *Principal Place of Business*

■ Pratt & Whitney of Canada is a Canadian corporation with its principal place of business in Quebec. Plaintiffs, however, contend that Pratt & Whitney of Canada should also be considered to be a citizen of the state where it has its principal place of business within the United States. This issue requires an interpretation of 28 U.S.C. § 1332(c), which provides:

"For the purpose of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

Section 1332(c) is subject to at least three possible interpretations. They are:

1. The traditional view that section 1332(c) is inapplicable to foreign chartered corporations, and thus a foreign corporation's principal place of business is irrelevant.

2. The view accepted by some courts that a foreign chartered corporation is a citizen of a state where it has its principal worldwide place of business; and

3. The view advocated by the plaintiffs that a foreign corporation is a citizen of the state in which it has its principal United States place of business, no matter how small its activities in that state are compared to its worldwide activities.

See, generally, Wright & Miller, *Federal Practice and Procedure* § 3628 (1975). An acceptance of either alternative 1 or 2 would preclude a finding of diversity in this action, while alternative 3 would arguably provide a basis for jurisdiction. Prior to 1958, a corporation was considered a citizen only of the state of incorporation. To restrict diversity jurisdiction, subsection (c) was added in 1958. That subsection, which is set out above, provides for dual corporate citizenship.

The application of § 1332(c) in cases involving suits between aliens would enlarge federal jurisdiction, rather than restrict it. The normal application of dual citizenship is to preclude a finding of diversity based on formal incorporation. As to a suit between aliens, however, dual citizenship may convert a foreign corporation into a citizen of a state, and thus permit diversity jurisdiction where it would otherwise be improper. Although this result is somewhat anomalous, it has been reached by courts that apply Section 1332(c) to a foreign corporation. *Arab International Bank & Trust Co. v. National Westminster Bank, Ltd.*, 463 F.Supp. 1145, 1147 (S.D.N.Y.1979); *Bergen Shipping Co. v. Japan Marine Service Ltd.*, 386 F.Supp. 430, 433–34 (S.D.N.Y.1974).

The leading case on the issue of the effect of section 1332(c) on alien corporations is *Eisenberg v. Commercial Union Assurance Co.*, 189 F.Supp. 500 (S.D.N.Y.1960). Plaintiff was a New York citizen; defendant was a British corporation with a principal place of business in London, but with a principal United States place of business in New York; diversity was thus lacking only if the Court looked to the corporation's principal place of business within the United States, the same construction of Section 1332(c) now urged upon this Court by the French plaintiffs.

The *Eisenberg* court held that Section 1332(c) has no effect on foreign corporations, and that an alien corporation's principal place of business is not to be considered at all. The Court relied on the use of capitalization in the statute. In Section 1332, "States" is used to denote a State within the United States, and "state" is used to denote a foreign state. The Court explained, at 189 F.Supp. 502:

"It is to be noted that the statute differentiates between States and foreign states by the use of a capital S for the word when applied to a State of the United States. Subdivision (c), therefore, in dealing with the *place of incorporation* refers only to a corporation incorporated in a State of the United States. When subdivision (c) goes on to deal with *principal place of business* it refers to the same corporation and thus only to a corporation incorporated in a State of the United States. The subdivision is not susceptible of the construction as if read 'all corporations shall be deemed citizens of the States by which they have been incorporated and of the States where they have their principal places of business.' Unless a corporation is incorporated by a State of the United States it will not be deemed a citizen of the State where it has its principal place of business."

The *Eisenberg* holding has been followed by a majority of the federal courts that have decided the issue. Wright & Miller, supra, § 3628. As stated in 1 *Moore's Federal Practice* ¶ 0.75[3], at 709.81 (1979):

"While the question is not entirely free of doubt, the status of alien corporations is probably unaffected by this amendatory Act. A few lower court opinions have required an allegation of the principal place of business of corporations chartered by foreign countries, but those cases in which the issue has been decisive have held that such foreign corporations are not covered by the 1958 amendment and are not deemed citizens of a state in which their principal place of business may be located."

Professor Moore indicates that policy supports extending the restriction of dual citizenship to alien corporations, but that this should be accomplished by further legislative action.

This Court has found no Tenth Circuit cases that expressly address the issue. Professor Moore does, however, cite *Newfoundland American Insurance Co. v. Suesz*, 289 F.2d 694, 695 (10th Cir. 1961), as impliedly following *Eisenberg*, since no mention of

the foreign corporation's principal place of business was made. 1 *Moore's Federal Practice* ¶ 0.75[3] at 709.82 n.9 (1979).

In an alternate holding, the *Eisenberg* court held that even if Section 1332(c) did apply to foreign chartered corporations, the corporation would be considered a citizen of a State only in which it had its principal place of business. The Court refused to read the statute other than literally, and rejected a construction that a foreign corporation would be deemed a citizen "of the State where it has its principal place of business" *within the United States*. The Court reasoned that the purpose of Section 1332(c) was not to abandon the protection from local prejudice against outsiders. Although a foreign corporation that has a principal place of business within the state may not be an outsider, a corporation that is both incorporated in and has its principal place of business in a foreign country may have very slight contact even within the State that is its principal place of business within the United States, and thus be an outsider even there.

There is a recent trend to adopt the alternative holding of *Eisenberg*, i. e., that where an alien corporation's principal place of business world-wide is one of the states of the United States, the corporation is deemed to be a citizen of that State. See *Arab International Bank*, supra. Such a holding would be of no avail to the French plaintiffs in this action, however, since Pratt & Whitney's principal place of business is Quebec. Only if the Court were to accept the third possible interpretation of Section 1332, expressly rejected by *Eisenberg*, could jurisdiction be found.

Plaintiffs have cited no case which accepts the proposition that a foreign corporation is a citizen of the state of its principal place of business within the United States. In *Arab International Bank*, supra, the court rejected such a construction, and stated, 463 F.Supp. at 1147 n.2:

"We have found only one case which appears to support plaintiff's construction of § 1332(c). *Sansone v. Ocean Acc. & Guarantee Corp.*, 228 F.Supp. 554 (D.La. 1964) (dictum)."

Sansone was correctly characterized by the court as dicta. The Sansone court did not even address the issue, but merely stated that since the foreign corporation's principal United States place of business was Georgia, diversity jurisdiction was proper. Since plaintiffs were all Connecticut citizens, diversity would have been present regardless of the construction of Section 1332. After finding diversity present, the Sansone court then dismissed for lack of jurisdictional amount.

Plaintiffs rely solely on the following statement from 1 Moore's Federal Practice ¶ 0.77[2–3] at 717.47:

"Another solution, and the one we believe best carries out the statutory policy, is to treat the corporation as a citizen of the state where it is chartered, and also a citizen of the state where it has its principal place of business in the United States, if that be different than the chartering state, no matter how meager such business may be in relation to the corporation's foreign operations."

The quote, however, must be considered in context. In that particular section, Moore is not addressing the problem of the foreign chartered corporation, but instead, the United States corporation with a principal place of business abroad. Moore elsewhere states that it is wise to await legislative action to extend the policies of the 1958 amendment to alien corporations. 1 Moore's Federal Practice ¶ 0.75[3] at 709.-83–84 (1977).

Congress apparently never considered the problem of the foreign corporation in enacting Section 1332(c). As a matter of statutory interpretation, there can be debate as to whether application of Section 1332(c) to foreign corporations fulfills congressional intent. Plaintiffs, however, are unable to point to any case in which a court has adopted their proposed construction of the statute.

In sum, this Court rejects the plaintiffs' argument that a foreign corporation is a citizen of the State in which it has its principal place of business within the United States, regardless of where its principal

place of business is on a world-wide basis. For purposes of this holding, it matters not which of the other two interpretations is correct. The issue does, however, become relevant in the area of piercing the corporate veil, to be hereinafter discussed.

### B. Piercing the Corporate Veil

Plaintiffs argue that since Pratt & Whitney is a mere alter ego of United Technologies, it is proper to consider the corporate citizenship of United Technologies as that of Pratt & Whitney. Support for the proposition that corporate veils may be pierced in considering the issue of subject matter jurisdiction is found in Wright & Miller, Federal Practice and Procedure, § 3625 at 801–802 (1975):

"The general rule in this situation is that a subsidiary corporation has its own principal place of business for purposes of diversity jurisdiction, unless it is merely an 'alter ego' or agent of the parent corporation. However, if the parent corporation is involved in an action, its activities may be merged with those of its subsidiaries in determining the principal place of business."

Some courts have applied alter ego analysis to subject-matter jurisdiction, although this Court has found no case that actually retained jurisdiction on that ground. de Walker v. Pueblo International, Inc., 569 F.2d 1169, 1173 (1st Cir. 1978); Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp., 461 F.2d 1140 (3d Cir. 1972); Coles v. Humble Oil & Refining Co., 348 F.Supp. 1240 (S.D.Tex.1972).

All the authorities refer only to piercing the veil to discover a corporation's real principal place of business. Such an action is based upon economic realities. None of the cases refer to using alter ego analysis to ignore a corporation's state of incorporation. A corporation is deemed a citizen of the state that created it. This is a purely formal matter. Inasmuch as plaintiffs seek to sue Pratt & Whitney as a separate entity from United Technologies, Pratt & Whitney must be considered a citizen of the state that created it. Alter ego analysis can,

however, be used in determining Pratt & Whitney's true principal place of business.

The foregoing discussion indicates that it may be appropriate to pierce the corporate veil, and thus to attribute United Technologies' principal place of business (Connecticut) to Pratt & Whitney Aircraft of Canada. Attributing Connecticut citizenship to Pratt & Whitney would make it a citizen of the State, being sued by an alien, and subject to diversity jurisdiction, *if* the rules of dual corporate citizenship contained in 28 U.S.C. § 1332(c) are construed to extend to foreign corporations. This is the issue which did not need to be resolved in the prior section. If Section 1332(c) does not apply to foreign chartered corporations, the fact that Pratt & Whitney's principal place of business world-wide may in economic reality be Connecticut, would simply be irrelevant.

It has been stated that the *Eisenberg* rule is reasonable, but that it can be argued that the alternative holding of *Eisenberg* is the better rule and should be adopted. Wright & Miller, supra, § 3628. The first court to abandon *Eisenberg* was *Southeast Guaranty Trust Co. v. Rodman & Renshaw, Inc.*, 358 F.Supp. 1001, 1007 (N.D.Ill.1973). The Court offered a reasonable explanation for not finding the "capital S" controlling:

"Obviously Congress would only use the word State with a capital S, since if a corporation's principal place of business was in a foreign state it would have no effect whatsoever on its citizenship for diversity purposes in the courts of the United States."

The Court then went on to explain that policies underlying Section 1332(c) were equally applicable to foreign corporations:

"While it is true that Congress apparently gave no explicit consideration to the effect of the amendment on alien corporations, our interpretation of its applicability better serves the express Congressional purpose of the amendment which was to limit the diversity jurisdiction of the federal courts. By enacting § 1332(c) Congress sought to preclude any technical finding of diversity, when, in fact, no

such diversity existed. When a corporation, while incorporated in another state, maintained its principal place of business in the same state in which its legal adversary was a citizen, it was felt neither to need nor deserve the protection of a federal court from any possible state court bias against an outsider. This rationale is no less compelling when applied to a corporation which has been chartered in a foreign country but maintains its principal place of business in the United States."

This same rationale was recognized in the alternative holding of *Eisenberg*.

In *Bergen Shipping Co. v. Japan Marine Services, Ltd.*, supra, the Court followed *Southeast Guaranty*. The Court concluded that overriding policy considerations compelled the conclusion that a corporation, alien or otherwise, with its principal place of business in a State should be deemed a citizen of that State.

The Court in *Arab International Bank*, supra, at 1147 & n.1, indicated that application of Section 1332(c) to foreign corporations was the modern trend and was the better rule. Likewise, the American Law Institute has endorsed the alternative rule. *American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts*, § 1301(b)(1) (1969). Nearly all commentators agree that application of Section 1332(c) to foreign corporations would be better policy. The issue is whether to await congressional action.

This Court does not find the capitalization rationale to be controlling. Congress simply never considered whether the subsection would apply to foreign corporations. The capitalization of "State" should not, therefore, be considered an expressed intent to exclude foreign corporations. Furthermore, as stated by the Court in *Southeast Guaranty*, supra, only if the principal place of business is in a "State" of the United States would it have effect for diversity purposes. The capitalization rationale is not compelling in view of the fact that application of Section 1332(c) to foreign chartered corporations would clearly better effect congressional policy.

Application of Section 1332(c) in this case, while enlarging federal jurisdiction, is not inconsistent with the stated purpose of the statute, allowing purely local controversies to be resolved in the federal courts. *Bergen Shipping*, supra, at 434. The effect of applying Section 1332(c) to a suit by an alien against a foreign chartered corporation that has its principal place of business in the United States, is to permit suit by an alien against a corporation deemed to be a citizen of a State of the United States by reason of its activities in the United States. Such a result is not inconsistent with the purposes of diversity jurisdiction.

The Court has previously held that plaintiffs have established a prima facie case to justify the piercing of the corporate veil. If the veil is pierced, United Technologies' principal place of business may be imputed to Pratt & Whitney of Canada. On the other hand, the issue of subject matter jurisdiction is always open. Should the plaintiffs fail to establish at trial that Pratt & Whitney Aircraft of Canada is the alter ego of United Technologies, then the Court will reconsider subject matter jurisdiction at that time. By insisting on a United States forum, plaintiffs are undertaking a course of action that entails some risk. An alter ego relationship must be established in order to impose liability upon United Technologies. Such an alter ego relationship must, however, also be demonstrated to find subject matter jurisdiction over Pratt & Whitney Aircraft of Canada.

## C. *Ancillary Jurisdiction*

██ United Technologies and Beech are parties for whom diversity jurisdiction exists. Since plaintiffs' claims arise from the same core of facts, they contend that the Court may retain jurisdiction under the doctrines of pendent and ancillary jurisdiction.

In *Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the United States Supreme Court held that a federal court had constitutional *power* to decide a state claim for which there was no independent basis for federal jurisdiction, when that claim was sufficiently related to a federal claim so as to constitute one constitutional case. The Supreme Court, however, made clear in *Aldinger v. Howard,* 427 U.S. 1, 14–15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976), that it is quite different to authorize two parties, already subject to the Court's jurisdiction, to litigate an additional claim, than to join an entirely different defendant on the basis of a claim for which there is no independent basis of federal jurisdiction. The Supreme Court emphasized that:

"Before it can be concluded that such jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress in the statute conferring jurisdiction has not expressly or by implication negated its existence."

██ Diversity jurisdiction has long been construed to require complete diversity. *Strawbridge v. Curtiss,* 3 Cranch 267, 7 U.S. 267, 2 L.Ed. 435; *Knoll v. Knoll,* 350 F.2d 407 (10th Cir. 1965). Although an alien may sue a citizen of a State in federal court, the presence of another alien as defendant destroys complete diversity. *Ed & Fred, Inc.,* supra; *Neeld v. American Hockey League,* 439 F.Supp. 459 (W.D.N.Y.1977); *Lavan Petroleum Co. v. Underwriters at Lloyds,* 334 F.Supp. 1069 (S.D.N.Y.1971). A few district courts have permitted the doctrine of pendent parties to circumvent the rule of complete diversity. This approach, however, has been criticized, and was rejected by the Third Circuit. *Seyler v. Steuben Motors, Inc.,* 462 F.2d 181 (3d Cir. 1972); Wright & Miller, *Federal Practice and Procedure,* § 3605, at 620 (1975). The better rule is that pendent jurisdiction over an additional non-diverse party may not be predicated upon an anchor claim based upon diversity of citizenship. *Wood v. Standard Products Co.,* 456 F.Supp. 1098 (1978), citing *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978).

This result is mandated by the *Owen* case, in which defendant brought in a third party defendant and plaintiff filed an amended complaint asserting a claim against the third party defendant, who was

not diverse from the plaintiff. The Eighth Circuit held that pendent jurisdiction was appropriate, but the case was reversed by the Supreme Court. The Supreme Court made it clear that the Congressional command of complete diversity could not be circumvented by the doctrines of pendent and ancillary jurisdiction.

> "It is not unreasonable to assume that, in generally requiring complete diversity, Congress did not intend to confine the jurisdiction of federal courts so inflexible that they are unable to protect legal rights or effectively to resolve an entire, logically entwined lawsuit. Those practical needs are the basis of the doctrine of ancillary jurisdiction. But neither the convenience of litigants nor considerations of judicial economy can suffice to justify extension of the doctrine of ancillary jurisdiction to a plaintiff's cause of action against a citizen of the same State in a diversity case. Congress has established the basic rule that diversity jurisdiction exists under 28 U.S.C. § 1332 only when there is complete diversity of citizenship. 'The policy of the statute calls for its strict construction . . . .' " To allow the requirement of complete diversity to be circumvented as it was in this case would simply flout the congressional command."

In Section 1332(a), Congress specified the two circumstances in which aliens may sue and be sued in the federal courts. Because the rule of complete diversity extends to actions by aliens, Section 1332(a)(2) does not apply to this action. Because Section 1332(a)(3) requires a dispute between citizens of different States, with aliens as additional parties, it too is inapplicable. Congress has established the rules of diversity jurisdiction. To permit ancillary jurisdiction to circumvent those rules would flout the congressional command, and is impermissible. This Court therefore holds that an alien may not join a state law claim against another alien, to an action against citizens of the States of the United States.

## IV. FORUM NON CONVENIENS

The doctrine of *forum non conveniens* permits a federal court to dismiss an action because a forum is inconvenient, even though venue is technically proper. Although the doctrine now has limited vitality because of the possibility of transfer under 28 U.S.C. § 1404(a), it does still have application when the more convenient forum is a foreign country, as is here alleged. Wright & Miller, *Federal Practice and Procedure*, § 3828, at 176–177 (1976). Dismissal on *forum non conveniens* grounds is to be the exception to the rule. The burden is on the defendant to show that the alternative forum is significantly more convenient. Unless the balance is strongly in the defendant's favor, the plaintiff's choice of forum should not be disturbed. *Schertenleib v. Traum*, 589 F.2d 1156, 1160 (2d Cir. 1978); Wright & Miller, supra, at 180. Use of the doctrine is restricted to when the forum is significantly inconvenient to the defendant. "The objective is not to locate the *forum conveniens*, but to avoid the *forum non conveniens*." Casad, *Long Arm and Convenient Forum*, 20 Kan.L.Rev. 1, 14 (1971). The ultimate question is whether the forum is so completely inappropriate and inconvenient that it is better to stop the litigation and let it start all over again somewhere else. *Paper Operations Consultants International, Ltd. v. SS Hong Kong Amber*, 513 F.2d 667, 670 (9th Cir. 1975).

Each case must be judged on its own facts. The question of whether to exercise jurisdiction or to dismiss on grounds of *forum non conveniens* is addressed to the trial court's discretion and can be set aside only for abuse of that discretion. *Paper Operations*, supra. This Court's discretion, although great, is limited, however, and must be exercised by a weighing of the conveniences of alternate forums. *Founding Church of Scientology v. Verlay*, 536 F.2d 429, 436 (D.C.Cir.1976).

Defendant argues that plaintiffs here should receive less consideration in their choice of forum, since they are not United States citizens. In the case of *Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d

880, 882 (2d Cir. 1978), the same proposition was asserted by a defendant, and the Court stated:

"Whatever the merits of that proposition generally, which does find some support in cases suggesting that our courts should be quite cautious in dismissing on forum non conveniens grounds when suit is brought by an American citizen, ... we think it has no application where, as here, a treaty between the United States and the foreign plaintiff's country allows nationals of both countries access to each country's courts on terms no less favorable than those applicable to nationals of the court's country."

Defendants do not dispute that such a treaty exists between the United States and France guaranteeing equal access to the courts. Plaintiffs are thus entitled to consideration equal that of a United States citizen in their choice of a United States forum.

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), the United States Supreme Court stated the relevant factors to be considered in determining whether a case should be dismissed on *forum non conveniens* grounds:

"If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name. And interest to be considered, and the one likely to be most pressed, is the private interest to the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

"Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself."

The initial requirement for *forum non conveniens* is that there in fact be an alternative forum. Testimony at the evidentiary hearing indicated that the French courts would exercise jurisdiction in this case, as this Court would have expected them to do. Additionally, both United Technologies and Pratt & Whitney of Canada have represented that they will consent to jurisdiction in France and pay any judgment rendered. Once defendants consent to suit, and this Court believes that the alternative forum will take jurisdiction, this Court should balance the relevant considerations. *Schertenleib v. Traum*, supra, at 1163; *Farmanfarmaian v. Gulf*, supra, at 882.

### A. Relative Ease of Access to Proof

All the decedents were citizens of France, as are their heirs and beneficiaries. The members of the flight crew were citizens of France. The crash occurred in France, and the wreckage of the plane, as well as other documentary evidence, is located in France.

Clearly, a portion of the relevant evidence is located in France. Plaintiffs, however, dispute the importance of eyewitnesses, since plaintiffs' claim is based on an internal failure of an engine. Witnesses to the design and construction of the engine and plane would likely come from the United States and Canada. The Court would expect that expert witnesses may be utilized, who will not necessarily be from France. Nevertheless, it does appear that evidence would be somewhat more accessible in France. Access to proof would not, however, appear to be an insurmountable barrier if the case were to remain here.

## B. Attendance of Witnesses

Although perhaps more time consuming and expensive, it would appear that the testimony of French witnesses could be obtained through utilization of letters rogatory. As far as the cost of obtaining witnesses, it would be more expensive to try the case in the United States if the majority of witnesses are from France. This, however, assumes the importance of eyewitnesses to the crash, which this Court feels is not established.

## C. View of the Premises

A view of the premises would obviously be available only in France. There is, however, no apparent reason why such a view would be appropriate in this case. If factors such as the length of the runway, type of terrain, or location of crash, do become relevant, they can no doubt be established through testimony, photographs, or other demonstrative evidence.

## D. Other Practical Considerations

Generally speaking, the case against Pratt & Whitney has more relation to France than to Kansas. This, however, is not simple binary litigation between plaintiffs and Pratt & Whitney. Beech Aircraft Corporation is also a party to the action by reason of having manufactured and sold the airplane that crashed. Evidence of Beech's activities here in Kansas in regard to testing and certifying the engine, may be relevant.

Additionally, Beech apparently prefers to defend the action here in Kansas. Dismissal of the case as to Pratt & Whitney and United Technologies would still leave an action in this court. Also, Beech has moved for leave to assert a claim against Pratt & Whitney, which would not necessarily be dismissed along with the plaintiffs' claims. The convenience of the parties, as well as the interests of justice, would best be served by resolution of all of plaintiffs' claims, and Beech's derivative claim, in one lawsuit. This factor counsels against dismissal.

## E. Enforcement of a Judgment

Pratt & Whitney has stipulated that it will pay any judgment entered in a French action. On the other hand, no claim is made that a judgment of this Court would not be enforceable. This factor is neutral.

## F. Vexation and Harassment

No claim is made that suit was brought in Kansas to vex, harass, or oppress the defendants, and the Court finds that there was no such motive. Kansas is Beech's principal place of business, and it is also Pratt & Whitney's primary market for the PT6 engine. Plaintiffs have sued Beech and United Technologies in their home country rather than abroad. Pratt & Whitney is sued in a forum where it has done substantial business, in particular selling the PT6, and where such a suit is highly foreseeable. If, instead, suit had been brought in France, defendants might have objected that they had no connection to France, and that only fortuitous events beyond their control resulted in the accident there. Once a United States forum is deemed appropriate, the District of Kansas may be the *most* appropriate forum in terms of the contacts of the defendants. There appear to have been sound reasons to choose a Kansas forum. Vexation, harassment, and oppression are not factors.

## G. Factors of Public Interest

The Supreme Court in *Gulf Oil* indicated that several factors involving the public

interest should be weighed. First is the administrative difficulties "when litigation is piled up in congested centers instead of being handled at its origin." This court, as do most courts, has a heavy docket of cases. However, there has been no showing that the case could be processed any more expeditiously in France. The Supreme Court also indicated that jury duty ought not be imposed upon a community having no relation to the litigation. In this case, however, Beech Aircraft is a party to the litigation and the airplane was manufactured in Wichita. The litigation does have a relationship to this community. The Supreme Court indicated that when cases "touch the affairs of many persons," the trial ought to be held in their view. This case, while important, simply is not a case affecting the broad public interest. It is a tort case which affects to a significant degree only the parties to the action. The Supreme Court also indicated that there is a local interest in having localized controversies decided at home. This simply cannot be construed to be a localized controversy. It involves citizens of at least four different countries. Finally, the Supreme Court stated that it was appropriate to have the trial in a forum that was familiar with the law governing the case. This issue will be discussed separately.

## H. Choice of Laws

Choice of law is a factor to be considered in *forum non conveniens*, but it is not controlling in and of itself. Defendants argue that French law applies. Plaintiffs, on the other hand, argue that Kansas law applies, and that this factor thus weighs against dismissal.

Current Kansas law applies the doctrine of *lex loci delicti* to choice of law for tort claims. *McDaniel v. Sinn*, 194 Kan. 625, 400 P.2d 1018 (965). Under *lex loci delicti* the law of the place of accident (France) would govern.

Plaintiffs persuasively argue that this Court should predict a change in Kansas conflicts law. This Court recently refused to predict such a change, but such refusal was based on the conviction that Delaware, not Kansas, choice of laws rules applied, since the case had been transferred here under the provisions of 28 U.S.C. § 1404(a). *Quandt v. Beech Aircraft Corporation*, No. W-4464 (filed December 8, 1978). Judge Richard Rogers, of this district, has also noted the sound reasons for predicting abandonment of *lex loci delicti*, but he refused to do so because the proposed "significant contacts" test would not have determined Kansas law to have been applicable in that case. *Hawley v. Beech Aircraft Corporation*, No. 78–4170 (filed September 7, 1978), aff'd, 625 F.2d 991 (10th Cir., 1980). Likewise, in this case application of a "significant contacts" test, as urged by plaintiffs, would not require the application of Kansas law. Thus, if this case is not dismissed, this Court will be faced with the difficulties of determining and applying foreign law.

Section 145 of the Restatement of Conflicts, lists four contacts to be considered. They are:

"(a) the place where the injury occurred (France);

(b) the place where the conduct causing the injury occurred (Canada);

(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties (France, Connecticut, and Canada);

(d) the place where the relationship, if any, between the parties is centered."

Plaintiffs had no relationship with Pratt & Whitney, or with United Technologies, other than flying in a plane supplied with engines manufactured by them. Plaintiffs argue that this relationship is centered in Kansas, where the allegedly defectively designed engine was incorporated into the plane. Even if this assertion were accepted, it is the only contact that would point to Kansas. The contention that the conduct causing the injury occurred in Kansas is not well taken as it concerns Pratt & Whitney. Pratt & Whitney's negligent conduct, if any, occurred in Canada, where it designed and manufactured the engine.

A "significant contacts" test would not point to Kansas law, but would instead choose either Canada or France. The Court need not finally resolve the conflicts question at this time. It is sufficient to note in regard to *forum non conveniens*, that this Court will be faced with the task of determining and applying the tort law of another country. This factor favors dismissal.

### I. *Conclusion*

There are obviously factors that would favor France as the most convenient forum. Plaintiffs are French, some witnesses and evidence may be more accessible in France, and French law will likely be the final choice of applicable law. On the other hand, it is not this Court's task to find the most convenient forum, but instead, to respect plaintiffs' choice of forum unless it is significantly inconvenient. Of importance is the fact that Beech is also a party, and all defendants may be joined in one action here. The action was not brought here to vex or harass the defendants. Pratt & Whitney and United Technologies have substantial contacts with the forum. A final factor is the length of time that this action has been pending in Kansas, while discovery on the jurisdictional issues commenced. There is no time limit on a motion for dismissal *forum non conveniens*. Nevertheless, plaintiffs already have a substantial investment of time and money in this forum, and much discovery was accomplished in ascertaining the jurisdictional facts. On the whole, the forum is not so significantly inconvenient to dismiss the case and thus require plaintiffs to start over again in another forum. The Court will not exercise his discretion to dismiss the action.

IT IS THEREFORE ORDERED that the Pratt & Whitney Group's motion to dismiss for lack of capacity, is hereby granted.

IT IS FURTHER ORDERED that the motions of Pratt & Whitney Aircraft of Canada, Ltd., and of United Technologies Corporation, to dismiss for lack of personal jurisdiction, are hereby denied.

IT IS FURTHER ORDERED that the motion of Pratt & Whitney Aircraft of Canada, Ltd., to dismiss for lack of subject matter jurisdiction, is hereby denied, subject to proof at trial of an alter ego relationship between Pratt & Whitney Aircraft of Canada, Ltd. and United Technologies Corporation.

IT IS FURTHER ORDERED that motions of Pratt & Whitney Aircraft of Canada, Ltd., and of United Technologies Corporation to dismiss *forum non conveniens*, are hereby denied.